FAIR, J.,
for the Court:
¶ 1. Andrew Hammond shot and killed William “Bubba” Thompson after a confrontation at the home of Gena Thompson, Thompson’s daughter. Indicted for murder and convicted of manslaughter, he appeals. Finding no error, we affirm Hammond’s conviction and sentence.
FACTS
¶ 2. In 2009 and 2010, Hammond and Gena were involved in a romantic relationship. This caused problems with Gena’s family because Hammond was married to another woman and had a young daughter. The Thompson family was adamant that Hammond should not see Gena until he was divorced, if at all. Hammond was twenty-one or twenty-two years old, while Gena was twenty or twenty-one.
¶ 3. On the night of November 12, 2009, Bubba Thompson, Gena’s father, and Thompson’s brother, John, confronted Hammond outside of the mobile home where Gena lived. .There were differing accounts of what occurred on that occasion. According to Gena, her father am *1076 bushed Hammond and beat him up. Her uncle John admitted he and his brother had waited for Hammond outside the trailer and surprised him, but he contended Hammond had attacked Thompson before the latter got the upper hand. John described the fight as brief and characterized Hammond as angry with Thompson rather than afraid of him.
If 4. Hammond and Gena continued to see each other after the November 2009 incident. According to Gena, Hammond moved in with her — though the evidence is conflicting on this point. Hammond regularly parked his vehicle at a nearby church, where Gena would pick him up and take him the rest of the way to the trailer. On several occasions, Thompson had entered the trailer while Hammond was present. On these occasions, Hammond went into the back bedroom, and Thompson left without incident.
¶ 5. On March 12, 2010, Gena returned home after spending a few days in the hospital to have a stent put into a vessel in her brain. That evening, she and a friend, Allie Douglas, picked Hammond up at the church. They returned to the trailer, and Hammond cooked dinner. The three were preparing to watch a movie when they heard a knock at the door. What happened next was disputed.
¶ 6. According to Gena, she called out for the visitor to identify himself, but no one answered. Gena told Hammond to go to the bedroom, which he did. Gena saw her father’s truck outside, and when she cracked the door, Thompson pushed it all the way open and entered the trailer. Gena instructed her father to leave and threatened to call the police, but Thompson pushed her onto a couch and began shouting for Hammond. Then he started “banging open” doors in the trailer, and when he reached the rear bedroom door and opened it, Hammond shot him once with a .40-caliber Glock pistol. Thompson fell down, got up and went outside, and later died from his injuries. Hammond surrendered to the authorities when they arrived.
¶ 7. Douglas, Gena’s friend, described the incident somewhat differently, though she frequently cited a lack of memory when asked to directly contradict Gena’s testimony. Notably, Douglas testified that Gena let her father into the trailer and that Thompson was no longer shouting when he began looking for Hammond.
¶ 8. The State offered other testimony seeking to show that Thompson, unarmed, was not much of a threat to Hammond. Thompson was forty-six years old, five feet ten inches tall, and weighed 260 pounds; he was said to be weak and in poor health following a liver transplant. Hammond, on the other hand, was twenty-two years old, six feet two inches tall, weighed 200 pounds, and was fit enough to work offshore. Thompson had been drinking before he was shot; his blood alcohol concentration was approximately .05 — somewhat less than the .08 “legal limit” for driving. Thompson’s wife testified that he drank alcohol when he was in pain from the liver transplant. She admitted Thompson did not tell her why he went to Gena’s home on the night of the shooting, but she believed he intended to take away Gena’s car, which her parents owned. They had conditioned her use of the car on her ending the relationship with Hammond.
¶ 9. Hammond was prosecuted for murder. His theory of the case was self-defense, and the jury convicted him of manslaughter. On appeal, Hammond contends the trial court erred in refusing to admit a recording of his 911 call shortly after the shooting. He also argues his conviction was against the overwhelming weight of the evidence.
*1077 DISCUSSION
1. The 911 Recording
¶ 10. Hammond contends he should have been allowed to introduce a recording of his 911 call to support his self-defense theory. The 911 call was made shortly after the shooting, and in the recording Hammond explained that Thompson had broken into the house, ignored Hammond’s warning that he had a gun, and was shot when he “jumped” at Hammond. Hammond told the operator he believed John Thompson was also at the trailer, armed, and would kill him for shooting Thompson. Hammond described John as “crazy,” and the operator instructed Hammond to barricade himself in the bedroom until the police arrived (but not to have the gun in his hand when they arrived).
¶ 11. After it rested its case-in-chief, the State made an oral motion in limine to exclude the recording. The State indicated it had recently learned Hammond planned to introduce the 911 tape at trial; Hammond contended he believed the State had planned to introduce it. The State argued the recording was self-serving hearsay and lacked a foundation for admission into evidence. During the argument, the trial judge observed that Hammond, if he intended to testify, might provide a sufficient foundation to admit the tape into evidence. Hammond affirmed his intent to testify in his own defense, and the judge indicated he would reserve a ruling on the motion to exclude the tape until after the facts surrounding its creation were established. At some point thereafter, Hammond changed his mind and decided not to testify, but the issue of the 911 recording never came up again on the record. There was no subsequent attempt to introduce the recording and no final, on-the-record ruling by the court that it would not be admitted.
¶ 12. At best the record shows the trial judge was skeptical of the recording’s admissibility and had indicated he would not admit it into evidence without further proof. Hammond was apparently satisfied with that ruling at the time, and as a result, he neglected to ever make a proffer of the recording and the foundation required to put it into evidence.[1]
¶ 13. “[I]t is the duty of the appellant to present a record of the trial sufficient to show that the error of which he complains on appeal has occurred....” Kolberg v. State, 704 So.2d 1307, 1322 (¶ 74) (Miss.1997) (citation omitted). Because of Hammond’s failure to offer the recording into evidence, we cannot say the trial court excluded it. We find no merit to this issue.
2. Weight of the Evidence
¶ 14. In his remaining issue, Hammond contends the trial court should have granted him a new trial because the jury’s rejection of his self-defense theory was against the overwhelming weight of the evidence. A challenge to the weight of the evidence will be successful only when the verdict “is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005).
¶ 15. Manslaughter is “[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense.... ” Miss.Code *1078 Ann. § 97-3-35 (Rev.2006). Thus it was the State’s burden to prove, beyond a reasonable doubt, that Hammond did not act in necessary self-defense when he shot Thompson. Id; see also Heidel v. State, 587 So.2d 835, 843 (Miss.1991).
¶ 16. Self-defense is defined by statute, in relevant part, as a killing committed “in the lawful defense of one’s own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished” or “in resisting any attempt unlawfully to kill [the defendant] or to commit any felony upon him, or upon or in any dwelling ... or in the immediate premises thereof in which [the defendant] shall be....” Miss.Code Ann. §97-3-15(l)(e)-(f) (Rev.2006). Additionally, the “castle doctrine” provides a presumption of reasonableness under certain circumstances potentially present in this case:
A person who uses defensive force shall be presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him or another or upon his dwelling ... if the person against whom the defensive force was used[ ] was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered, a dwelling ... or the immediate premises thereof or if that person had unlawfully removed or was attempting to unlawfully remove another against the other person’s will from that dwelling ... or the immediate premises thereof and the person who used defensive force knew or had reason to believe that the forcible entry or unlawful and forcible act was occurring or had occurred. This presumption shall not apply if the person against whom defensive force was used has a right to be in or is a lawful resident or owner of the dwelling ... or the immediate premises thereof....
Miss.Code Ann. § 97-3-15(3) (Rev.2006).
¶ 17. The events precipitating the shooting are largely uncontested, but there are significant disputes. This Court is required to accept as true all evidence consistent with the defendant’s guilt, along with any reasonable inferences that might be drawn from the evidence. Young v. State, 891 So.2d 813, 821 (¶ 21) (Miss.2005). Hammond cannot rely on the castle-doctrine presumption because there is conflicting evidence as to whether Gena let her father into the residence. The record also presents conflicting inferences as to whether Thompson posed an immediate danger to Hammond. Thompson was unarmed, and as the State points out, he was in a weakened physical condition. Hammond had also emerged from their prior confrontations without serious injury.
¶ 18. A new trial based on the weight of the evidence should be granted “only in exceptional cases in which the evidence preponderates heavily against the verdict.” Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005) (citation omitted). And the motion for a new trial is entrusted to the circuit judge, who had a first-hand view of the trial. “[R]eversal is warranted only if the trial court abused its discretion in denying [the] motion for new trial.” Ivy v. State, 949 So.2d 748, 753 (¶ 21) (Miss.2007).
¶ 19. The evidence we have discussed above presents a jury question as to the necessity of the use of deadly force. Given the deference owed to the jury and the trial judge, we cannot say the verdict is against the overwhelming weight of the evidence.
¶ 20. THE JUDGMENT OF THE CIRCUIT COURT OF LINCOLN COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF *1079 TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH TEN YEARS SUSPENDED AND FIVE YEARS OF PROBATION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT. JAMES, J., NOT PARTICIPATING.

. The recording and its transcript were never offered into evidence at the trial or even marked for identification purposes; however, they were designated for — and appear in — the record on appeal without objection from the State.